Case number 20-1289 et al. TransCanada Power Marketing Limited Petitioner v. Federal Energy Regulatory Commission. Mr. Sunbeck for the petitioner, Mr. Kennedy for the respondent. Good morning, counsel. Mr. Sunbeck, when you're ready, please proceed. Good morning. Thank you. May it please the court, Mark Sunbeck, counsel for Petitioner TransCanada. We'd like to In that decision in 2015, the court noted, quote, FERC made no effort to define the relevant markets or determine the participants' market power. We're back, and one of the reasons we're back is that FERC still has not made any meaningful effort to define the markets or test participants' market power within those defined markets. Having failed to define a market adequately, FERC can't make a determination regarding the existence or exercise of market power in any meaningful or judicially sustainable fashion. First, the geographic scope of the market has not been identified or even addressed by the commission on remand. There was no showing or geographic market would be. The system operator, for various purposes, breaks itself down into many different units. For instance, their dispatch zones, their reliability zones, their load zones. There can be as many as 19 different fractured pieces of the system operator, but the commission never addresses what the proper size of the geographic market is. Nonetheless, the record clearly shows that geography was an important limiting characteristic for terms of the products. You'll see, for instance, in both the testimony that accompanied the initial filing and the bid material. I think something about this question, this issue, which is the question of market definition, the way that it was presented in the rehearing papers and also in your opening brief was pretty bound up in your argument that the commission erred by not applying the market-based rate regime correctly. And I just understood that the commission doesn't even address the market definition argument in its response brief, and we can ask the commission why. But I had understood your argument about market definition, including the geographic scope of the market, to be bound up in your argument that the commission erred in its application of the market-based rate regime, as opposed to a freestanding argument that there's a problem with market definition. Your Honor, we don't intend for that to be the interpretation at all. There are a variety of standard guidelines for determining, as you know, whether there's market power. And different agencies have different yardsticks, I'm sorry, different tests and ways of dealing with determining market power. And we're not saying that in this instance, clearly there was a, let's call it prefabricated template that was available for use that the commission decided for whatever reason it was not going to use. We contend that it was error not to use that prefabricated method. But regardless of whether they did use it or not, there is, in addition, the substantive error of if you're not going to use the existing rules, then you have to come up with some way of determining what the relevant market is. And they haven't. They've presumed that the geographic market is apparently, although they haven't even explicitly said this, the entirety of the system operator's footprint, even though the system operator repeatedly has determined that it's, especially in periods of not free-flowing communication of electrons from Northern Maine to Southwestern Connecticut, there are many bottlenecks. And we've seen that in many cases before this court and in the materials that were actually submitted by the system operator, which recognized the importance of, for instance, the North-South and East-West zones, if you will, and where assets were located within those. It would be amazing that having been sensitive to the locational needs in order to achieve the goals of enhanced reliability, if the commission then said, it's all one big market, one big happy market, we don't care. Obviously, the system operator cared very much. And so when we get to, for instance, the quantification of the size of the market, and when the commission says, oh, well, we're not going to test the market at 1.95 million megawatts, we'll test it at 2.25 million megawatts, the commission's just expanding the market and thereby diminishing any result of market power that might be determined regardless of geographic limitations or the important product market limitations. But the commission gave a pretty extensive explanation as to why market power was not a serious issue in this case. I mean, you really are wanting them to go to form. And what they are saying is, this was a special circumstance. We used the bidding, the auction process to address a special one-time circumstance. And they're entitled to do that if they justify it. You really want them to go to a particularized form. They didn't. And they acknowledged they didn't. You can't characterize it by reference to pre-existing forms. They use the auction approach here, and they explained why market power was not an issue. I don't know what more they're supposed to do. What's your quibble with their explanation? It's pretty extensive. What's your quibble with their explanation as to why market power is not an issue? Your Honor, there is an extensive volume of verbiage, but just like the decision involving the Environmental Defense Fund, BFERC, that was issued by this court in June of this year, a lengthy order is not to be confused with rigorous analysis. No, no, no. You're avoiding my question. I'm asking what's wrong with the explanation. They have given an explanation, long or short. They've given it. They have explained. They looked at two different approaches on the cost, and they explained why they were adopting the approach they did, and they explained why market power is not an issue. And they explained that, no, they're not using what would appear to be routine to you because this was a special circumstance. There's nothing in the law that prohibits that. Your Honor, first of all, they did not claim this was an experimental program. Second... Not experiment. You're putting words in my mouth. Okay, I apologize. They didn't say experimental. They said they devised this approach, this auction approach to address this situation. It's just like your argument on retroactive rate making. It doesn't make any sense in light of what they're doing. It's just not a viable argument. It misses the point. They had a single problem here they were trying to address, but I still would like to know why, what the particular mistakes are in your view with respect to their answer to there's no market power issue here. Your Honor, the market monitors report details the absence of specific information that was information necessary to compute costs. And the claim is in their justifications, oh, well, we already determined costs. We did a proxy determination of costs, and that allows us to draw the intercept between demand and supply and match that to the actual bids. Well, if you're using made up quote cost unquote data, then sure, you can probably get there. But if you add a 25% adder without any quantification, any justification for the quantification, if you put your thumb on the scale for all the other costs, including presuming when there's a bid, it should be justified as either the higher of cost base, which there are no actual costs for many of the elements, as you can see in, for instance, pages A4 and A5 of the IMM's report filed on January 23rd, then there's no substantial evidence behind this. This is all conjecture. The commission could have, without any materially greater effort, obtained the cost data from the 18 participants rather than allowing half of them to basically say, no, we're not even going to give it to you. If this was really cost justified, you would think that the merchants would have every incentive to provide that information to the market monitor and say, look, we invested quite a bit in making sure that this service was available. They didn't. The market monitor got stiff-armed, as you'll see in its report on a lot of the data, and so the market monitor tried to come up with some kind of proxy. But in light of the fact that the service was represented to be a cost-based service from the outset in 2013, according to the testimony of the ISO and its own filings, it's passing strange that the commission and the market monitor and the system operator did not require the production of information. Let me ask my colleagues if they have additional questions for you, Mr. Sunbeck. I don't. No. I don't. Thank you, Mr. Sunbeck. We'll give you a little time for rebuttal. Thank you very much. We'll hear from the commission now. Mr. Kennedy. Good morning, your honors. Robert Kennedy on behalf of the commission. Petitioner's argument had two basic tentpoles. One, the commission erred in defining the market, that it should have been broken down further, and two, that the commission erred in failing to, I guess, press the bidders for actual cost information above and beyond what they supplied to the market monitor. Neither of those issues were raised in TransCanada's request for rehearing, and they've been waived. The request for rehearing is at page 211 of the joint appendix. It was concise and that the Federal Power Act precluded the commission from using a market paradigm to evaluate the results of this auction, and it said the commission had failed to point to substantial evidence that supported the use of a 25 percent ban to judge competitive bids, and within that was sort of a look at the weighted cost of capital information and verify it that was provided by the bidders. With respect to that last minor point, that is one input in a multi-input formula that the market monitor used to evaluate one of the risk elements in his bid construction, and the commission explained why that was wrong in paragraph 27 of the rehearing order. Sort of better explain why it believed the rates resulting from this program were just and reasonable. Before you just go there, on market definition, in the rehearing petition of JA-221, the rehearing petition does say, second, the commission failed to make an ex-ante finding of the absence of market power or even describe what are believed to be the dimensions and parameters of the relevant markets when approving the program under a market paradigm. Well, I think, again, as you pointed out, that was part and parcel of their argument that the commission's market-based rate program, all the elements of the commission's market-based rate program had to be followed here in order for the commission to use market principles to judge the reasonableness of the resulting bids. Is that how you understood it and understood the commission to understand it, is that that was part and parcel of this argument about that? It is how I took it and it's clearly how the commission took it because as Judge Edwards observed, I mean, these are pretty comprehensive orders and the commission made a determined effort to respond to the remand with respect to, you know, why the commission came out the way it did, why it thought these rates were just and reasonable. The commission went into more detail on the benefits side that this is an undisputed risk to the New England region for if there isn't oil backup available to the natural gas generators in New England, it could cost ratepayers up to billions of dollars in lost revenue in the region if the blackouts were to occur. Now, obviously, the commission didn't say, well, we got a billion dollars on the benefit side, anything goes. It took a hard look at the resulting cost of the program, which was $75 million. It compared them to a competitive benchmark. It looked at whether there were aspects of the design of the program that could reasonably be assumed to curb the exercise of market power. And then again, it looked at the expert analysis provided by the Internal Market Monitor. With respect to the first, comparing it to a competitive benchmark, the commission said, okay, what would have happened if we used a uniform clearing price where under bidding theory, participants are encouraged or incentivized to bid as close as possible to their costs to ensure that they clear. Everyone gets the same price, gets the price of the marginal unit. And when the commission did that, it found that had that market construct been used for the winter reliability program, the cost would have been $88 million, $13 million more than what resulted here. So that was one data point that the commission looked at in assuring itself that these rates were just and reasonable. Then it looked sort of at theory. It accepted the market monitor's view that there were, that there's structural market power issues here. And the commission defined the relevant question as whether, is there evidence that it had been exercised? And it first looked at the design of the program and found there were a few that there was a lot of uncertainty on the demand side. The program rule said the market monitor was looking to obtain up to 2.4 million megawatt hours per month. And it could come in less than that as it did. And as it showed in the program rules and in the first auction, the system operator showed itself to be a price sensitive buyer. The cost the first time around were too much versus what they got. So they went back for more. The commission found that would tend to incent people to bid a bit closer to their costs. So to ensure that they, their bid is actually selected. The commission also noted that under the program rules, the market, the system operator wasn't just like... Can I ask you one question about that point, which there's on the 25% adder, because it bears on the 25% adder. There's two points that are being made in the commission's order and in the briefing that seem at least somewhat intention on the surface in my mind, but you tell me what's wrong with this. So for example, on page 45 of your brief, you explain why the commission was right in finding it unlikely that the participants knew they had market power. And in other words, that the market's functioning competitively. And the first point made is that the winter reliability program was an entirely new product market, which has the capacity to make it function more competitively in terms of the bidding, I take it. And then on page 58, in explaining the 25% adder, which sort of goes in the opposite direction because the adder boosts the price, the point is made that the winter reliability program was a novel market with many unknowns. And so it seems like the same point that the winter reliability program was a new product market, both keeps the prices in the competitive range, but also justifies the 25% adder. Well, I think obviously the commission is talking about two different things, but to answer your question, yes. I mean, the commission thought that market participants, because this was a brand new market, wouldn't be aware that they had market power. And so as a result, they would tend not to exercise it. What the commission is doing with the 25% adder, I mean, the question is, the commission has to, and the market monitor as well, set a price and create a presumption above what price should we deem a bid to reflect some exercise of market power. And sort of the options were the marginal cost-based bid identified by the market monitor or something else. And all parties, the market monitor, the system operator, and the commission agreed that some accommodation needed to be made for these additional factors. The fact that parties, yes, it's a brand new market, so they would be unlikely to exercise market power, but they also don't really know how to value these bids because it's never happened before. So we don't want to penalize and characterize conduct that is innocent and is competitive simply because it doesn't match up, it falls within a band of the market monitor's price. So that's kind of why the commission used the analysis in both places, that it is new, so people will be unlikely to know that they had market power and know how to wield it. But they're also preparing these bids for the first time, and there may be, we need to account for that and allow some bandwidth above the market monitor's competitive cost-based bid before we create our presumption of an exercise of market power, which again, as we noted in our brief, is kind of consistent with the way the system operator does it in its tariff with its other established markets. The internal market monitor will create a reference bid, and when it's reviewing an actual bid, there's a bandwidth. If it's sometimes $25 or 50% over the bid, if it falls within that range, it will not be deemed inappropriate, and that's kind of the same process that the internal market monitor went through here and the commission adopted. So am I right? I'm not saying this is necessarily wrong, but am I right in understanding that the commission thought that the novelty of the market both had the effect of keeping bids within a competitive range, which is i.e. suppressing them, but also had the effect of raising the bids to build in some kind of risk premium, and that's why you could justify the adder? Well, I think if I could put it this way, yes, it has the effect of limiting the exercise of market power because it's new, but also there's uncertainty around what a competitive bid is because of the novelty, so we need to The assumption being they haven't bid enough and we want to make sure they're getting what is reasonable, that's the adder? No, the assumption is that they, you know, is a bid, I mean, they're getting what they bid, you know, the adder doesn't give them any costs or anything like that, but it's there as a mark for the commission to say anything above this, going to presume to be the result of market power, and anything below, we're going to deem it to be competitive. Okay. So it's for that purpose. My time's expired, if there's other questions. I don't think we have any further questions for you, Mr. Kennedy, thank you. Thank you, your honors. Mr. Sonbeck, we'll give you two minutes for your rebuttal. Thank you, your honor. Several points. First, the reference by counsel to the two tests applied by the Uniform Clearing Price Analysis, the first one he referenced is premised on the cost study of sorts. So if the costs presumed in the study were erroneous, then the Uniform Clearing Price Analysis can't be presumed to be valid. The second test that the commission used, according to him, was based on the inflated 2.25 million megawatt hour market, which once again, disregards any limits on geography or product markets. The reference to price uncertainty and price sensitivity that the ISO had, first of all, the winter reliability program was disproportionately approved by generators seven to one, and opposed by end users in the markets committee by seven to one. So there was a price sensitivity, but the sensitivity on the part of the generators was to a higher price. And that's why it was approved. So yes, there was price sensitivity. There was also urgency, as you'll recall, in the August 26th filing, no, I'm sorry, August 9th filing, the ISO tells the FERC, we haven't got enough, we need to hurry up. This is really a little short of a crisis. So that undercut the notion that there was price sensitivity depressing the price. Council referenced the standard the commission used, which was we presume anything over this is clearly the exercise of market power. Well, regardless of whether that's appropriate, that subsumes a potential for the exercise of market power below that, it's just not as obvious. We disagree with the characterization offered by council that the commission made that second step, which was to say, oh, and it's obvious that prices below this threshold don't represent the exercise of market power. In fact, the ISO, as well as the market monitor in the January 2017 filing, acknowledged that the overcharges could be as much as $6.6 million. Finally, oh, I'm sorry. So if you have one final point, you can make it quickly. The 25% adder, in addition to being unjustified to start with, was taken whole cloth by the FERC and applied to a much higher reference price. Recall the market monitor applied it to a $15 price, which yielded a $3 nominal increase. The FERC gave no consideration to whether that was still an appropriate nominal increase as opposed to this conceptual percentage increase. Thank you for your attention and questions, your honors. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Edwards